Good morning again, and may it please the courts, Your Honor. Rachel Mateo Boehm for Courthouse News Service, entering my appearance again for the new case. I'd like to reserve five minutes of my time for rebuttal. We believe the preliminary injunction in this case erred in many respects, but the point I'd like to talk about today is the idea that access of eight business hours doesn't create a First Amendment problem. Oh, let's just talk about procedurally where you are right now. I guess it looks like there was going to be a hearing yesterday, or evidentiary hearing on the merits. Did that occur? No. There is a final hearing in the district court proceedings on July 11th. The parties have stipulated to a – It got continued? I thought it was set for yesterday. It got continued. Okay. It's set for July 11th. For a trial? So the parties stipulated to a summary trial on a written record. Evidence has been submitted on that. Trial briefs have been filed. The only piece left to come is the July 11th final hearing at which the parties will give closing arguments and answer any further questions from Judge Guilford. So should we wait to decide the preliminary injunction ruling until after the district court issues the ruling on the merits? Or what's your position? We anticipated this question would probably come up. And our research indicates that I think the question in our minds was, will this appeal be rendered moot by a ruling, a final ruling? The injunction would merge into any final judgment. The injunction would merge into any final judgment. So at the point of a final judgment, the law indicates that this appeal would be moot. However, we don't see anything to indicate that it's moot right now before a final judgment. And we also – So taking account judicial resources, what are you recommending? What's your position and what's your authority for it? It's so hard to get an answer today. I'm not sure why. I'm sorry. I'm trying. Our position is that the court should reverse the order denying a preliminary injunction in this case. We believe it will provide guidance. So proceed without waiting for the merits? Yes. And why? Just give me your reason why. Because we believe an opinion from this court will provide guidance to Judge Guilford as he makes a final determination in this case on the merits. And we believe it may be sometime – we don't know when he'll issue a final ruling in this case. And we believe he erred in denying the preliminary injunction in this case. We believe that the concept that delaying access for eight business hours is per se constitutional, violates circuit precedent, is contrary to law in other circuits. And it's eight business hours. Is it within the same day or not within the same day? No, eight business hours bleeds into the next day. It could be the same day? It could be the same day, but in many instances it will not be the same day on a court that's open from 8 to 4. Well, so now we're back to the statistics and the data, and everybody has their own very interesting way of looking at it. And I asked you previously about the delays that you are experiencing in the case. And in this case, I think, you've been asserting that 49 percent of civil, unlimited complaints were not available the business day they were received. And so let me – hopefully I'll be more successful this time than the last time. What percentage of newly filed complaints do you have access to the same day they were filed? Right now or? In Orange County, right now. On the basis of this record? Yes. On the basis of this record, the percentage that we had access to was just over half. Based on what? What do you point me to where in the record that supports that? And then is that different from what's happening right now? In the declaration of Juliana Krolak, in support of our motion for a preliminary injunction in that case, she talks about tracking that they did, that we did, to determine the delays. And we based our delays entirely on the court's own data. We looked at the time according to the court's records that a case was received, and we looked at the time that a payment receipt was issued. And per Juliana's declarations and per the court's own declarations, the court's practice was to provide access to that case approximately 15 minutes after a payment receipt was issued. But what we measured was the delay. We didn't count that. We measured from the time a complaint was received until the date, time a payment receipt was issued. What percentage of newly filed complaints do you have access to within 48 hours or two business days of when they were filed? Within two business days. It's going to be a relatively small percentage. Again, I'm going to restrict myself to the record on this appeal. I'd like two, then, answers. The record here and then currently. So, currently, and I'll do my best to get my records of delays here. So, currently, we have a motion for summary judgment decision that says that delays of one calendar day are per se okay. So, in our trial briefs, we provided information to the court about delays and setting aside the fact that the records room closes at 4 p.m., even though complaints can be filed until midnight and still receive that day as filing day, setting aside that whole issue which we talked about. Are you talking about Planet now or Yamasaki? No, I'm talking about Yamasaki. We have a similar situation in the Yamasaki case where the court closes its records room where complaints can be viewed at 4 p.m. They can be viewed online, but for a charge that we contend is not consistent with the First Amendment. Well, that's a separate issue. Yes. They close the records room at 4. They continue working until at least 5 o'clock. So, in that way, it's similar to the Planet case. But complaints filed up until midnight on a court day receive that day's filing date per the court's procedures. And you're okay with the Planet current procedure, which closes at 4 p.m.? Under the Planet current procedures, because Planet is a paper filing court, if it's filed that day, it gets that day's filed stamp. We're following the filed date for the purposes of determining whether access is timely here. Do you have an average, I guess an estimate on the average delay in access once a complaint is received by the court that you are experiencing for any given complaint? I'm sorry? Do you have an estimate of the average delay in access once a complaint is received by the court that you're experiencing for any given complaint? On the basis of this, the preliminary injunction? The record, and then also currently. The information that I have is that almost half of complaints are delayed between 1 and 9 calendar days. I guess this is the whole reason that Judge Guilford ordered a trial, because you're saying that, they're saying something completely different, and the basis is very unclear for both. And so you're saying we should go ahead and rule based on what we have here in front of us and not wait for a merits trial. I'm just trying to figure out what the path is here for us. Our concern with the preliminary injunction order, among many concerns, is that a per se delay of eight business hours means that as a general course, you're going to have access delayed by at least one court day for a lot of complaints on an ongoing basis. And that carries over through weekends and holidays, and you're talking about delays that are effectively often not just one day, but three or four days. And the purpose of the First Amendment right of access is for speech, for speech about the courts. And it's our contention that delayed access discourages speech about the courts. It makes it less likely. It's contrary to the principles behind the First Amendment. It leads to situations of you can't, it's effectively a secret civil action. But then we're back now to immediate access versus, And I'm not sure how we make a test based on what you're asserting. You pounded the podium on immediate access or contemporaneous, but you're really meaning immediate. And I think from your perspective, 30 minutes, an hour, that would still violate. And so I'm just trying to figure out how to assess at this point in time and I'm not sure you're giving me a test to work with. I can't, for the same reasons that I think Judge Otero decided a bright line test was inappropriate. I think the test has got to depend on. I'm not saying you need to tell me 30 minutes or an hour. I'm just, from what I'm hearing you, from what I'm hearing from you, though, you're saying that it has to be immediate. I don't think it needs to be immediate, but I think you have to look at the particular policies that are being challenged at this particular time. I'm here to talk about the Yamasaki case for this appeal. Let me ask you a question. This is the part I don't understand about your argument. If you, so if Courthouse News pays a small fee, it has immediate access to the electronic filing, correct? That is not correct because access is not provided until after complaints are processed. And how long does that take? It takes a day or more per our statistics of delays of between one and nine days. And those statistics are disputed? Not in this particular case. Well, so I don't understand, and I must not understand the system, the electronic filing system there because in our court we have electronic filing and if you pay a very small amount to be on PACER, you have automatic access to whatever is filed unless there's an exception for, you know, like something's filed with the motion to seal or it comes up as a record that the district court has sealed. And I think that's quite reasonable access. And I would hate to have our court sued because you had to pay a small fee to join PACER. We are not saying there's anything wrong with the PACER system. There's anything wrong with it. But isn't that identical to the system? No, it's not. There's two important differences, and I'm running out of time, so I'm going to try to answer this question. I would like you to answer some of these questions. Frankly, don't be worried about the time. If we're asking the question, answer it. Her question is very important. I hope you think about this. Pretty important question. There are two differences between the PACER system and the system at issue in the Yamasaki case. The first difference is that while in most PACER courts complaints, once they're received for filing, flow directly for online viewing, that is not happening at Orange County Superior. They're sitting in a queue, and they're not released for viewing until someone processes them. And the second important difference is that as is true in many federal courts under PACER and as is true in Orange County, if you go to the courthouse itself, you don't have to pay for PACER. You can see it. And this is not a situation where courthouse news needs its own copy. It just wants to see most of it. You probably couldn't go to San Francisco. You certainly couldn't come to Pasadena and see it. And I doubt you could go to San Francisco and actually see it because we are so dependent on the electronic filing system now. I mean, I don't even know when we get the paper copies, if any. In the declarations that we've submitted in connection with this motion for this preliminary injunction ruling, and there are a record in this appeal, reporters and editors attest to how again and again and again in PACER courts, they go to the federal courthouses, they sit down at the PACER terminal, they look at the new complaints, they see them, and then they go home for the night and check them long after the court is closed for the day. And they're seeing new complaints as they come in, sometimes without case numbers, because under the federal system, access is not conditioned until after processing. That is the main difference between the federal system and what Orange County is doing. Okay. Thank you. Thank you. I guess I want to hear from the Housing Council on what the difference is in the systems. May it please the Court, Nathaniel Garrett for appellee David Yamasaki. Judge McGee, I'd like to start with answering your question about statistics. In Yamasaki, the parties actually agree with the data. Both parties are using the same data to calculate the statistics, and the difference of opinion comes entirely from whether you count processing times by business days or calendar days. That's the entire dispute is which is the appropriate calculation to use. In this record, you have to look at ER 1011, which is where Sarah Choa states that under court records, 89.2% of complaints are provided within eight business hours, and 96.5% are provided within 15 business hours. We realized at some point that it was getting really confusing talking about business hours versus calendar days, so we've now switched to calculating those statistics according to business days versus calendar days, and that's where we are now. What that data shows is that 97.52% of civil unlimited complaints are available within one day, in either words, same day or next day. So when CNS says 49% of civil unlimited complaints are not available the business day they were received, it's the Thanksgiving example that was given before. When you have a complaint filed on a Friday night, and it's made available Monday, or if it's Martin Luther King Day and it's available on Tuesday, they're calling that, CNS is characterizing that as a three- and four-day delay, whereas we characterize it as a one-day delay. Because you're using business days and they're using calendar days. Correct, and that issue is teed up now for Judge Guilford. For his final judgment, we've briefed which is the appropriate measure to use, because at that point you can really make some good determinations about whether the complaints were provided in a timely manner, and I think that's why, from a practical perspective, I do think given how far along we are in this case, there's good reason to let Judge Guilford finish the job and provide the court with a full decision on a full record that the court can review. I can't cite you a case suggesting that's the appropriate way to do it. I just think as a matter of practicality, the Ninth Circuit generally encourages getting to a final trial. Let me ask you the same questions I asked CNS, and I don't know if you know, what percentage of newly filed complaints do you have access to the same day they were filed? I don't know, and the reason is because when Judge Guilford held on summary judgment that there was no right-to-same-day access, we shifted the focus. We said, well, that must mean that providing it within the next day is sufficient, and so that's why we calculated according to the next day. And then what percentage of newly filed complaints do you have access to within 48 hours or two business days of when they were filed? Two business days, 99.01 percent, Your Honor. And then do you have an average on the daily, average delay in access given once a complaint is received by the court that is occurring for any given complaint? In other words, the average is 8 hours or 10 hours. We've not yet calculated that. I think it would be pretty easy to do with the data. Why would it be 8 hours? Why is it delayed 8 hours? So the prime difference between Yamasaki and Plano, Your Honor, is that the Orange County Superior Court has a policy of reviewing complaints for confidentiality, and so what happens is the complaint comes in. Usually in the day there are two rushes of when complaints come in, the lunch hour and then right before closing. So they will then turn to those complaints in the order received, and once they're able to turn to the complaint, it takes about 10 or 15 minutes to review the complaint for confidentiality, and then they do at the same time process the complaint. That's confidentiality in accordance with state law and to determine whether there's a motion to seal? No, Your Honor. To determine whether the complaint should be sealed under state law but hasn't been flagged by the filer as being confidential. So is this what CNS is challenging? Yes, that's precisely what they're challenging, Your Honor. So this is the process where it takes 10 to 15 minutes for one of the four docketing clerks, that's what I'll call them, to look for that exact purpose? Yes, they're trained so it takes 10 to 15 minutes. The reason processing times are not simply 10 to 15 minutes is because they have to get through the stack. The backlog within that stack. Exactly, and so maybe the first complaint of the day is processed in 10 or 15 minutes, but then there are examples of where they have to work through the stack, and then there are examples where there are longer delays, and that could be, for example, the court doesn't reject complaints. Often when there's a mistake with it, they'll have the lawyer try to fix it, and that may take three or four days, so that would be a three or four-day delay. So once they're processed, do you put them on the electronic docket? Correct. They're electronically published, and the way that works is it's actually better than PACER in one sense in that you can go into the courthouse and get it for free. If you're in the courthouse with the monitors, you can download that information for free. If you want to access it online on your own laptop, then that's where the charge comes in. And what's the charge? I've known at some point. I want to say it's about $7.50 for the first page, and then a certain number of cents up to a maximum of $40 per pleading. That sounds like a lot of money, actually. Do you know how much it costs to join PACER? I don't. Fortunately, my firm pays for those fees, but PACER was sued over the fees they charged under a First Amendment plan. So the privacy concerns that are cited is what you just confirmed with Judge Ennars. I just want to confirm that for myself. Is that right? Yes. So the court, and I wanted to address Judge McGee. I don't know if I heard you correctly. In the beginning of the plan, it sounded as if you were asking somewhat about, well, why can't the filers take care of that? Was that a question you were asking, or did I mishear? Well, I think somebody did come up. It seems to me you're adding a different issue into the middle of this case that everybody took out of the last case, in that the last case civil complaints were those which the state had already determined, that there was nothing confidential therein, and that was all that we had left. But it seems to me in this case what the state has determined as the confidentiality has not been taken out of the case. That's right. I think it's actually the centerpiece of the case, and that's the big difference, because in this case the policy being challenged is the delays are precisely because of the confidentiality rules. And so CNS says we don't want those complaints. We're not interested in looking at them, which may be true, but they want the policy that prevents some of these complaints from being caught to be enjoyed. So in a sense it is central to the case. So I guess just the difference here in Orange County is are these reviewers looking for that, or is it more quality control, that the person who's filed it has indicated that it's confidential, pursuant to whatever reason, either case-related or statutory-related reason, and they're doing quality control of that, or they're doing the initial? I'd say more the former Judge Merguia. They're looking for mistakes. Twenty-six percent of the limited civil complaints are by pro pers. So they're looking for cases where they've been trained to find, you know, this actually has some confidential information in it or by statute needs to be protected, and the filer didn't catch that. And so at the front end we need to catch that and then protect it. Now, at the same time, I want to be clear, for administrative purposes, they've made a determination to then do the processing at the same time, which includes, for example, figuring out if the person is a vexatious litigant. If they're a vexatious litigant, they won't file the document at all, assigning a judge, things of that nature, but they do that at the same time because they found that saves resources. So in this case, what are you suggesting should be our test? Yes, Your Honor. So there are, as you noted, Judge Smith, we see this as two tests that go in sequential order. There's the press enterprise test at first to determine whether experience and logic require that access be given. You've already ruled on that. Your co-counsel conceded that. I agree, but my only point would be, Your Honor, it depends whether it's viewed as, certainly ruled there's a right of timely access. I think the question is whether at that point you move on to time, place, and manner, or whether you ask, is what they're actually seeking in this case, which again is same-day access, whether there's experience and tradition and logic to that type of access, or whether you simply say it's enough that. Yeah, I'm not sure that's the correct analysis because once we say there's a right of timely access, then we have to ask ourselves, so you have a first-amendment right to that, and it's really a right that the press has on behalf of the public. And then we have to say that courts are only human, and they can't, unless they develop new systems or go like the Ninth Circuit went, provide that access. So what test do we look here, and what is the... Right, so I think one way to do that is to then shift the burden to the courts to satisfy the time, place, manner test, which we think would be the second test. All I'm suggesting is that there could still be part of the initial test, which is, well, what does timely mean, and has it been violated here? And Judge Merguia and Judge Schmidt and Judge Warlock, you've all asked, what would those standards be, how do we judge that? You've talked about some of them. Well, I think you've come down to reasonableness, and I'm sure you're going to be arguing about what the significant governmental interest is in having this delay, because we're not saying access denied, we're saying access delayed. And how do you, I don't know, maybe, and is the procedure you're using narrowly tailored to meet that particular governmental interest? And you're saying it's an administrative interest, you have a court with thousands and thousands of cases being filed, and you do have to administer the filings. It's actually more than that. It's the interest the court has in protecting the privacy of those who come before it and those who are involuntarily hailed before it. I guess my worry about this is, supposing that I agree with you that we take the first test and we say, okay, there's a right to access. I'm not sure the first test deals with a right to timely access. Why does press enterprise have anything to do with timely access? It seems to me press enterprise is to whether there's access at all under the First Amendment. Only because, Your Honor, it does seem to me, and I don't want to repeat what my colleague said, but it does seem to me that cases looking at the First Amendment right of access have really looked at not just is there a right to horse gathers generally, but is there a right to the kind of access you're seeking? Not just is there a right to watch executions, which is California First Amendment Coalition, but is there a right to watch the beginning of the execution? So here everyone agrees they're getting access to the complaints. The question is, is their constitutional right being violated because they should get it before they're already getting it? That's my point. Then when we get to time, place, and manner, if in fact we get there, at that particular point in time, I guess my next question is, is the fact that you're weeding out stuff as it relates to privacy or as it relates to confidentiality, as it relates to all of that, is that a violation of the time, place, and manner test? No, we believe it's not. Why? Well, first, it's not content-based. What do you mean it's not content-based? If you're going to say anything that's a business secret or a trade secret has to be weeded out, isn't that content-based? The policy itself, which is to review complaints for confidentiality, is applied irrespective of the subject matter of the complaint. And the standard is, and this is Long Beach Area Peace Network, the law is content-based rather than content-neutral if the main purpose in enacting it was to suppress or exalt speech of a certain content or if it differentiates based on the content of speech on its face. We're not doing that here. We're simply trying to abide by the confidentiality standards. We meet the other tests as well. I can go through those. I do want to note there's been some discussion of the alternative channels of communication. It has not been noted that there's numerous cases in the right-of-access context that don't apply that last part. A case called Shark from the Sixth Circuit is one of them, a case called Barber v. Conradi from the Northern District of Alabama is another, and it turns into more of a balancing test of the benefits of unfettered access against the restriction, which we've now argued to Judge Guilford, and we'll see what he says, is a more appropriate way of analyzing this under the time, place, manner test. Leaving out the last program. Correct, Your Honor. That's what we have argued, and next week, I suppose, or two weeks, we'll see what he says about that. Your opposing counsel argues that that doesn't give short shrift to the time, place, and manner test by only applying two instead of three. What's your response to that? Well, I think it's not giving short shrift. It's modifying it to the circumstances presented. And so in Shark, for example, it's not that they just cut out a standard. They replaced it with something they felt was more appropriate, more of a balancing, simply because this is a test that developed in another context. So to say it gives it short shrift essentially assumes the question of whether it should be transposed entirely to a different context.  Yeah. Thank you, Your Honor. Do we have an amici? Yes, Your Honor. Okay. Good morning, Your Honors. Mary Christine Sengailov, Haynes & Boone on behalf of the amici, Orange County Bar Association, Family Violence Appellate Project, National Association of Women Lawyers, and other legal aid organizations. So in our amicus brief, we focused on the countervailing interests, the strong privacy interests that the court is protecting through its procedures. And I know you already talked in depth about the time, place, and manner test, and that Judge Guilford talked about the likelihood of success prong for the preliminary injunction. So I wanted to focus on alternative grounds for affirmance in this case, focusing on the preliminary injunction standard itself, and in addition to the likelihood of success prong. And that would include whether there's a benefit to the public interest from a preliminary injunction and whether a preliminary injunction would strike the right balance between the various hardships, given the potential for injury or death from the disclosure of litigant names in this case in the name change petitions by domestic violence survivors under the Safe at Home program. And as to these elements, courthouse news bore the burden to establish them, that an injunction should issue here, and it failed to sustain that burden, given the policy and the interest in protecting the privacy concerns of litigants. So we would assert that the injunction, the denial of the injunction, could be affirmed without having to get to the merits, the likelihood of success in this context, leaving that for later determination or for Judge Guilford to get to those merits in his trial. Why wouldn't we just wait for him altogether? You could also do that. I mean, it seems to me, aren't you really emphasizing tests which are not quite as important as the likelihood of success test? Well, they're all relevant factors. They're all there. They're all under winter and are relevant factors. I appreciate they're all there. But the honest truth is the likelihood of success test will overwhelm all the rest of the tests, wouldn't it? Well, and I think as the record on the preliminary injunction definitely shows the presence of these privacy interests, the statutory and rules protections of them, the confidentiality of this information, and the fact that there are a lot of self-represented litigants and those who might not get it right. And so there is a reason to protect these interests and to have Orange County review them to make sure that things weren't missed. And as the record was developed on summary judgment, it showed, in fact, they caught 18 of these in their process. So it's working to reveal some that should have been. Let me ask you, if I can, because one of the government interests you cite that are important is the budgetary constraints, I believe you identify in your briefing. Is that right? Well, budgetary constraints are, I think, were a factor for the district court in this case as well. But that's in terms of whether you could, what would you have to sacrifice to speed this up even faster? But I think that the primary interests that Judge Guilford talked about and that we talked about in our brief were the very strong privacy interests, particularly with regard to the budget. No, I know that. But you did cite budgetary constraints as a reason, additional reason. I'm not saying it was your primary reason. I just was curious on what your authority is for the position that mere economic or budget issues are sufficient to allow for, you know, a curtailment of this kind of access. Well, I think that as Judge Smith mentioned earlier, it could be a factor given the overall context of the case. And I think here they're really kind of married together with the privacy interests that they are trying to protect in terms of the cost. If you're trying to get it faster, how are you still going to have a procedure that would protect privacy interests of litigants and do that in a way that makes fiscal sense and budgetary sense for the court? And I was just looking for your best authority on that. Is there a case that balances these and says that that way? Well, just the way I read your brief, you cited certainly the privacy, but you also cited the budgetary. And I'm aware of the budgetary. People have been talking about that, including me. But I'm just curious on what was your best case for that. Yeah, so in this context, there is not a case that would say that the budgetary interests itself or concerns itself would outweigh assuming there's the right of access. All right. You have a question? It's Chapter 12. Move it along. Do you have a question? No, I'm fine. I had one, but it's okay. Go ahead. I was going to say, so Judge Guilford, what's he going to try? What issues? Are you not the right one to ask that question? I think that I'm not the most positioned to answer that. And you've got Judge Wardlaw on your side. I will withdraw the question. Yeah, because we still have to give two finals. I understand. So you can ask. Okay. Thank you, Counsel. Yes, thank you very much. Ms. Mateo-Vein. Thank you. What is he going to try? You said there were stipulated facts or issues or something that have been submitted. The precise issues that Judge Guilford is going to try are the parties have different points of view on that. But one of the main issues, and I think the main issue he's going to try, is the extent to which delays of longer than one calendar day are an issue in the underlying case. And it's our position that those delays are especially implicated when it comes to – well, let me stop and just answer your question. Wait. You said the parties have different views as to what Judge Guilford's going to try? For example, we read the motion for summary judgment order as not being clear as to whether the experience and logic test as applied here has been finally decided. I know that the Orange County Clerk views that issue as having been already decided in the motion for summary judgment. That is one. Also, one of the issues identified in the motion for summary judgment order is the issue of alternative channels of communication and to what extent those are implicated in this case. Those are the issues that come to mind from that order. Judge, the reason I ask the question is it seems to me that this case comes after the Planet case, and so therefore Judge Guilford has in front of him, first of all, whether there's any access at all. And that's with the – if you use the test that we've outlined in Press Enterprise, right? And he's trying to determine that? Or has he already determined that? He used the Press Enterprise test to make a determination that, at the very least, delays in access of one calendar day were timely. He recognized that this court has – he seemed to agree that there is a right of timely access to complaints. His question is, what level of delays violate that right of timely access? And the issues to be tried are delays of those greater than one calendar day, per his summary judgment order. So he's decided that one calendar day doesn't violate the right to timely access? That's what he's decided, yes. In what? A summary judgment motion? In the summary judgment motion. Which is not on appeal in front of us. We will be – not right now, no. When did he decide that? He decided that in early May. But we don't have a final judgment yet because he hasn't issued a final judgment in this case. So that will merge into the final judgment in this case and may be the subject of a subsequent appeal. All right. Thank you, counsel. Thank you. Any further questions before we – okay. All right. Courthouse News Service v. Yamasaki is –
judges: Wardlaw, N.R. Smith, Murguia